Good morning. I'm Ron Swafford. I'm from Idaho Falls. I represent the appellant. I originally asked the clerk if I could be third, but after living through two of these, I'm not so sure that was the right decision. I want to start out by giving the court a bit of a history. This was a sexual harassment case that was tried in Bannock County, ultimately, in 2007. As far as the history, my client, Mr. Horkley, and his entities own two service stations in Rexburg. He began an intimate dating relationship with the respondent in 1992. That continued off and on in different phases and different degrees until 2002. The respondent is divorced, was then, has two children, had a college degree, and they worked for Mr. Horkley during most of that period of time. They agree and admit throughout at different points and some disputed periods that they did have a sexual relationship. We agree, but what are the issues that you bring to us as a court of appeals? The first issue I want to address, I apologize, is the issue of a mistrial. I think it is a critical point. Mr. Summers is the individual that testified with regard to the mistrial. He testified first that he had observed some sexual harassment. You went after him with a bulldozer to try to get him to admit that there was some kind of a recording that might show that your client was innocent. Yes, that's correct. You knew you were walking into a minefield based on his deposition testimony. Well, I did not believe so. I didn't think anyone would bring up that issue because it's unrelated to whether or not there's a tape recording. I wanted to find that tape recording because I know it is in my heart after the deposition. It existed, and he knew where it was. He could find it, and it would help defend this case. You had no evidence of that, though. Well, I disagree. I was not permitted, although I asked, to show his videotaped deposition. That's the one where he took the Fifth Amendment? I beg your pardon? That's the one where Summers took the Fifth Amendment? At some points, yes. But he still testified that there was a tape, that he had an ex-Secret Service man. For the life of me, I can't figure out why this wasn't all resolved before the trial started. I mean, you walked into something that the trial judge, Judge George, said was the most bizarre trial he'd ever been involved in. I agree. And it almost appeared to me that you were trying to get him to take the Fifth Amendment again. Why wasn't all this stuff resolved before the jury was called? And you got into this, whether there's a tape or not tape. That's classic discovery information. I really doubted that they would call Mr. Summers as a witness. And when they did, it left me no choice for him to testify as to the things he said he saw. And then for me to know that there was... How could you doubt that he would be called as a witness? He was on the witness list. Well, if he was on the witness list, but after the deposition, and considering what happened, it was obvious I did not believe that they would call him, nor did I expect them to ask him those questions. And you pushed, and you pushed, and you pushed, and he started talking about waterboarding, and he said, I lied, and I mean, this really got out of control. And so the judge said, you know, when the other side came back with his business about the murder plot, they said you opened the door to all of this by getting into it. Why isn't that correct? I don't agree that I opened the door to testimony regarding attempted murders and conspiracy by asking about a videotape which would help me defend my clients. Well, didn't you know that's what reportedly the videotape was all about? No, it's not. The videotape was installed in his office, and it would have shown some of the things he claimed happened, and so that they were consensual and not sexual harassment. And all I was looking for was to be able to establish that. If, in fact, he was recording those events, then we should be looking at the tape recording, not his history of those. That's all I intended to get to. It was the plaintiff, after I was prohibited from going further, the plaintiff asked another question, an important question. Why did you put the camera in there? There was no reason for that question except, for one, it was intentionally trying to poison the jury. Did you object to that question? Absolutely. The other side says you did. That's not true. I did object to it, and the judge said, overruled. I am going to allow him to answer that question and make clear this up. That's the court's response. Well, I guess the worry that I have with all of this is it seems to me that your question about the videotape, about the installation of the camera, about all of the things that you were trying to go to, I guess, getting to the last verse on that particular matter, how do I, what's the standard review then for me to determine whether there should be a mistrial? I think it was an abuse of discretion. So then if I'm to give the district court discretion in determining this, and the district court, based on your questioning, goes to where they went to, and there they are, and now we're asking another question, and I'm going to say the judge has now given all of the discretion he is entitled to under the rule. I'm to say what he allowed was an abuse? I believe it was, Your Honor. He admitted. In what case would suggest it is an abuse? I'm sorry? What case would suggest? There is no case I could find quite like this, Your Honor. It's a very bizarre set of facts that I've never run into either. Well, bizarre set of facts is what the district court has in front of it all the time, but given that it is there, it is the one who does not have any bias making the decisions. This Judge Nevada had no idea about all of this, and there, knowing, listening, hearing all the stuff, then makes a decision, and then I'm to say it's an abuse. Your Honor, the court's statement before he denied the mistrial was that there really was no way to cure this, and counsel for the plaintiff admitted there was no way to cure this. But see, the point here is I read this record. Neither one of you wanted a mistrial. The other side initially said, well, we'll move for a mistrial, and then it withdrew the motion. He asked you if you would be adverse to a mistrial, and you said yes, you didn't want a mistrial. And then after you talked to the judge, he said, well, let's see about a curative instruction, and he decided to work on a curative instruction. Now, how do you then, when neither one of you wanted a mistrial, you come up here and say the horrible error by the judge not to declare it a mistrial? Well, we took a lunch break right at that point. We came back right after lunch, and my client said, no, I want a mistrial. I renewed the motion again and said, Your Honor, we do want a mistrial. After thinking about it through lunch, going over it, there was no way to fix this. Your client looked at the jury when all that stuff about the murder plot came in and said, I think we need a mistrial. Well, he did. I gave him the option of what to do. We've spent a fortune on this case since 2003, and it was an enormous decision. But it basically involves so many things that I don't think involve plots to murder. Well, Judge George says that he gave you some leeway, and you took more rope than he gave you, and you, quote, created the problem. That's the trial transcript, Volume 2, on Day 3. And then he says you opened up the entire area by digging into the middle of this thing. I only dug into the existence of a camera and a tape. That's all I ever asked. It was the plaintiff, and I disagree with the court's statement. It was the plaintiff that said, Why did you put the camera in there? I didn't ask that, and that wasn't important why. It didn't matter why. All I wanted to know, is there a camera and a tape? Would it show? Well, it's hard for me to believe that if you thought there was a camera that would show that these acts of sexual harassment didn't happen, that you wouldn't have done something prior to the trial in order to get at that, especially with somebody taking the Fifth Amendment, who's now complaining he was waterboarding, he was lying, he got mad at the lawyers. I mean, this was wild. This is one of the craziest witnesses I've ever read. Well, and I have to agree with that, except during the videotaped depositions, and he said that at the end of it, actually, he contradicted himself and said, Well, I don't have any tapes. I don't have any. I didn't believe him. There was nothing I could do about it at that point in time. I wanted to test him and see what he would say in front of a district judge and in front of a jury on that exact question, because he would not make up spending $15,000 to have an ex-Secret Service agent install a camera, unless there was something to them. Do you have any other issues, Mr. Swofford, that you want to especially... Yes, I do. There was a 4034B motion in limine to exclude character witnesses at the inception of the trial before trial. You're talking about the Seabrook testimony now? Yes. Yes, it was. Originally, the district judge granted our motion in limine and declined to allow any additional third-party women to testify as to any bad acts or character testimony regarding Mr. Horkley. On the third day, the trial took several months to complete. What was your defense? I'm sorry? What was your defense? Under 404B... No, no. What was your defense? How did you defend the case? What's the theory of your defense? They had a consensual relationship. They had that consensual relationship. Well, in my understanding, your defense was there were benefits to the plaintiff that were unrelated to the sexual conduct. All of the defendant's conduct was just made in jest and that the plaintiff consented to the conduct. That seemed to me to be the thrust of your defense. My defense was intended to be that they had an ongoing mutual intimate relationship. Okay. Ongoing mutual relationship. And then at that point, you're suggesting then that the judge should not, under an abuse of discretion standard again, have allowed other witnesses to show that the plaintiff did not consent to the conduct. Because your whole defense was consent that some of this conduct was in jest, that there were benefits to the plaintiff that were unrelated, and now they're bringing in other people who are saying, we didn't consent to any of this junk. At that point, you've allowed for the judge to think about this again. Well, I disagree. I think the thrust of 404B is to exclude evidence of other acts, which might. Well, I appreciate that. But other acts, unless it shows motive, intent, lack of mistake, or lack of consent. But I think that one of the elements of 404B to allow it to be introduced into evidence as another witness would be that it's a material element in the defense. I'm sorry, a material element in the claim being made against the person. It doesn't matter in a sexual harassment case, Your Honor, whether or not she consents. It doesn't really matter what his motive was, what his intent was, if he did it. If it was offensive to her, and it happened, and it damaged her. Then why did you put the defense up that you did that the plaintiff consented? I mean, my worry is, Mr. Swofford, that after you had put on testimony about all this stuff about consent, and about how you were involved, and how you didn't care, and it was all a part of the whole, that then the judge has to think about this and say, well, it seems to me, even under 404B, there are exceptions to the rule, and therefore we let in the testimony. But I don't think it falls within any of the recognized exceptions. In fact, I think it falls outside that exception, because consent is not a material element of the offense with which he's charged. Is this more probative than prejudicial, or was this more prejudicial than probative? That is one of the tests, and I agree it's a test, and I believe it was far more prejudicial. Why? After what had been said in this particular matter, why? Assume for a moment what this lady, that he had a different, okay, how do we know it's the same kind of relationship? How do we know what the circumstances were? How do we know what their kind of relationship was? There are too many factors and too many elements and too many facets of this for anyone to be able to compare that. What you're really saying, if you do this, is if you did this to this person, you must have done it to this person. If you committed negligence on this date, you must have done it on this date. All right. We hear your argument. Anything else you want to talk to us about? We have two other issues. One of those, we do not believe, and we strongly disagree, that they met the statutory employee test of having 20 or more employees in each working day and each of the 20 or more calendar weeks during the prior year. Really, here again, we're in kind of a tough situation here, Counselor. I read through your complaint, the answer, the amended complaint, the amended answer. I read through the discovery. It's a little tough for me to suggest that you're saying that they had to prove this when your complaint and your discovery and what you said during a deposition even suggested they had to do this, that they had to even prove it. And that's all the judge said. Based on what you did in your answer to the complaint and the amended complaint and what you said during discovery, it doesn't need to be proved. I disagree. There's two aspects of this. One, the only thing that the plaintiff, the only point that they brought up is the issue of 15 or more employees or five or more for the state case and 15 or more for the federal case. There's another whole element or facet of this that must be proven. It must be established in addition to that that they each worked 20 days. Okay. They've got to go forward. The employee must work a minimum of 20 or more calendar days per week in the current or prior year. It's a payroll issue. The plaintiff brought that up as a payroll issue. But they brought no payroll records in to show how much they worked or how long they worked to satisfy the other prong of the test. They can't get there without a payroll approach. So your argument is it was their burden of proof. It's an element they had to prove, and you have not, prior to that point, at any point, put anything in that would give Judge George the idea that you had absolutely stipulated to it. No, that's correct. Now, what about then that you admit before the Human Rights Commission the things that you're now complaining about? We admitted that they had five or more employees, but we never admitted anywhere that the employees each worked 20 or more calendar weeks in each of the preceding year. That's the difference. We knew they had that many employees, but it was seasonal. There were people coming and going. There were drivers. It's a college town. There were college students working there. There's a tremendous turnover. There's two service stations. We never agreed that they met the other prong of the test. We know there were 15 in a calendar year, more than five and more than 15. Did you ever file any jury instructions? Yes, we did file a jury instruction. The court refused to give that instruction. When did you finally file your jury instructions? The instruction on this point was late. Did you file any objection to the plaintiff's jury instructions? We had a hearing on the jury instructions. I objected to not giving an instruction on this point, and the judge declined to give that instruction, saying it ought to move. Didn't you really? Your only instruction that you gave was claiming the plaintiff had the burden of establishing the employment status under Equal Protection Act. That's the only jury instruction I saw. What does that have to do with this? I believe there was one stating I don't have that instruction. All right. Thank you. We'll hear from counsel. Appreciate your argument. May it please the Court? My name is Deanne Casperson. I'm here today on behalf of the appellee, Jody Wyatt. What did the alleged murder plot have to do with this case? It didn't have anything to do with this case. I agree. And Mr. Fowler threw it in into the middle of this case and polluted everything. It was something that had nothing to do with a case that, on the face of it, is grotesquely prejudicial. The problem was is that instead of using that testimony and just to impeach Danny Summers, the appellants would not quit on that point. They created a false impression that there was some tape out there that existed that would prove that Jody Wyatt was never sexually harassed. Again, what does that have to do with a supposed murder plot that happened years and years and years before? That doesn't explain any of this testimony because Mr. Fowler's position was there never was a tape and it had nothing to do with anything. I just don't understand this thing comes in out of left field. That's not what opening the door is supposed to permit, something that has nothing to do with this case, that's on its face for a pretty prejudicial. The problem was is that we had to demonstrate to the jury that any suggestion of a tape had nothing to do with Jody Wyatt and had nothing to do with sexual harassment. But there was no tape that was associated with the murder plot. Well, Danny Summers testified that there was no tape, but the problem was is that continual questioning, nonstop for minutes upon minutes about it, left this impression that there was this tape out there. Mr. Summers himself created that impression in his deposition. Will you not agree with that? He did. So what's the problem with pushing him on it? Well, I think the difference is is whether you use that for impeachment value or whether you're trying to create a false impression that there's evidence out there that somehow the plaintiff didn't produce. Now, appellants own that premise. They did nothing to search the premises to see if there was ever a tape there. They didn't do anything throughout discovery to see if they could find that tape. Mr. Summers was... that has nothing to do with this case at all about some remote possibility of a murder plot involving Summers and Horkley. I think we had no choice but to let the jury know that any idea of ever even putting a tape in there had nothing to do with sexual harassment. It wasn't intended to prove sexual harassment. It wasn't even intended to observe it, and it happened well before most of these facts were even considered. Even the judge's reaction was this is out of control. The most bizarre case I ever saw. And had it not been for both counsels saying they didn't want a mistrial, it seems to me that the judge was prepared to grant one on the spot. Yes, but I think the question is is on what basis? I mean, it caused the plaintiff a great deal of injury, too, in terms of that there was this impression that somehow this tape existed out there. They have quoted me as saying, you know, you can't walk the cat backwards on this issue. My concern was not so much about the murder plot, but the impression that had been created that somehow there was a tape out there that would exonerate their client because this went on and on and on. What's the connection between somehow there was a tape and an ancient possible murder plot involving someone completely different? Well, there was clearly the suggestion throughout the questioning that this tape existed and if it were produced, that it would show that Jim Harkley never touched Jody Walker. I'm not connected. So your side gets to come in and say there was a murder plot 20 years ago involving Harkley and Summers. Well, we had to have Mr. Summers. How does that explain a tape or not a tape existing? Well, it doesn't say whether it existed or not. Right. But it demonstrates that it didn't have anything to do with Jody Walker. What's the if it didn't have anything to do? Because your side was that there was no tape involving the murder plot or anything. Right. I guess that the imaginary tape. It was like a giant dump truck came into the middle of this trial and threw in this monstrosity of a murder plot. There's no doubt. And I have to admit, we didn't believe that appellants would ever ask any of these questions because of the risk of that coming out. In hindsight, I wish we would have filed a motion to eliminate or one side would have filed a motion to eliminate to address this beforehand. But the evidence that they opened the door to, we were. . . Well, you know, opening the door doesn't mean you get to come in with something that has nothing to do with the case that on its face is grotesquely prejudicial. That's not what opening the door means. Opening the door means you've gotten into something that requires explanation that's relevant to the case. And I just see this as totally irrelevant to your case. But, Your Honor, we tried throughout all of that questioning. There were probably I don't know how many sidebars throughout that section saying this questioning has to stop. Appellants were given direction from the district court. You have three questions to ask. Ask those things and move on. All of that may be true. It still may not open the door to coming in with this murder plot stuff. Well, I think it was corrected. When was it corrected? Not contemporaneously. By the limiting instruction that was given. When? The next day. The next day. It wasn't even contemporaneous. I mean, this is a bill that's awful hard to unwrite. I don't think it was. Harkley's soliciting somebody's murder, not having anything to do with this witness or this case. I think you have to look at the appellant's role in that. I mean, I don't dispute that this was so far afield of anything to do with Jody Wyatt. But I think that bill could be unwrote. I think it was a well-crafted jury instruction or limiting instruction. You know, I went back and I looked at Summer's testimony, which is just beyond bizarre, and I still don't see why it would necessarily improper for the other side, although they should have probably straightened this out beforehand, to start pushing him on this tape. He's the one that suggested in his deposition testimony that there was such a tape. But he also testified in his deposition that this tape would have been placed in there like in 1994, well before any of these acts were ever set forward. And then he said he lied because he was being waterboarded? No doubt. I think Judge George said it correctly. It was bizarre. Most bizarre case he'd ever seen. He's been on the bench for a long time. Yes. And his initial reaction was, you can't unwring this bill. This has to require a mistrial. It was his initial reaction. But he also stated, too, when we came back, he said, I think giving the limiting instruction is the perfect balance. First, plaintiffs wanted a mistrial. Defendants didn't. And now, plaintiffs don't want a mistrial, and defendants do. And he said, I have faith in juries. If I tell them to ignore that evidence, I believe that they will ignore it. And I believe they did. I think that limiting instruction cured the damage that had been done to both parties that should have never happened in this case at all, because it really had nothing to do with Jody Wyatt. I don't disagree. The other issue that's been raised by counsel is the Trish Seibert testimony that I'd like to address real quick. Well, as far as I can understand, Judge George sort of conditionally thought it wouldn't come in until he started hearing the case. Then he started hearing the case, and he went through book chapter versus why it should come in. And I just wanted to point out how careful the judge was throughout that procedure. I actually wanted to use Trish Seibert as my opening witness. I wanted to refer to that testimony. He made you wait. He made me wait. To see what the case was, and then he went through the statute. I agree with him. Okay. I appreciate that. Let me talk about the attorney's fees. We didn't have a request for attorney's fees, and a proper time. It must be filed within 14 days of the judgment. And now we request attorney's fees, and now we say we ought to get plenty, and you got plenty. I would disagree in that it was timely from the amended judgment that had to be entered. And what we've cited in our briefing, it's out of a little bit different circumstance. The Supreme Court has ruled on the timing for an appeal as to when it begins to run, and they've looked at judgments. So that's the case law that we could find the most comparable to refer this to. In that case, what the Supreme Court said is if that amended judgment changed a matter of substance, or it corrects an ambiguity, then the time for appeal begins to run again. Now, I don't think there can be an argument made that that first judgment was incorrect and very ambiguous. It would have allowed us to get a judgment as against any of the three defendants for the entire amount. What we had to go back and correct, and I believe one of the parties would have had to correct it or it would have become an issue at some point. We had to have the verdict correctly reflected in that judgment to split out the awards that were for or against Mr. Horkley individually versus the ones that were against the corporations. That started the time again. In addition, the judge also decided that we had proven excusable neglect, which would be appropriate for that time frame since it's not jurisdictional, because of the deadline where it fell right during that week. And what is my standard of review on that decision, on the excusable neglect decision by the district judge? Abuse of discretion. In fact, I would assert that every issue that has been raised by appellants in this matter is to be decided under an abuse of discretion standard. With regard to the argument about the number of employees, I just want to address this briefly. What the complaint specifically said was that we alleged that the defendant corporations had 15 employees, bringing them under the ambit of Title VII and the Idaho Human Rights Act. Paragraph 6 was admitted. And it was admitted. Because there was a confusing sort of affirmative defense, we came back in discovery and said, please justify what facts support your affirmative defense. And again, they withdrew any complaint with regard to Horkley self-serve, although they continue to do so. To the defendant who had the judgment taken against, correct? Yes. Yes. Of course, when we came to trial, we had no idea that that was going to be a disputed fact. Even if they could file some jury instructions timely, we may have been put on notice that they were at least going to test it. But I think under the Lace Law decision, it's very clear that an admission takes the burden of proof away from the other side in that matter, from the plaintiff. What do you say to this idea that he's not really talking about employees, but he's talking about, I'm trying to remember his words, but I don't. So you heard it. Okay. Well, number one, I think they've made an admission, so I don't think it's relevant. But number two, I think they have to go back to the Walters decision and see how the Supreme Court has set forth how you count employees. It's my understanding appellant's position is that every employee has to work on that day. And that is not the case under Title VII. We decided that it's a payroll method. So you look to see how many employees were on the payroll, regardless of whether they worked necessarily within that time frame. You can imagine how difficult it would be if we had a decision that was contrary to that. The last thing I wanted to address was the issue about whether we had adequately applied assault and battery. I know that has not been addressed. Well, if it hasn't been addressed, do you really want to get into it today? It's probably briefed. I don't think so. Thank you very much. Thank you very much. I think you've already used all your time. Judge Smith, may I exercise a point of personal privilege? You may. Mr. Swafford, please accept this as constructive criticism. Your blue brief was very deficient. You don't have a table of contents in it. You're required to have a table of contents. Let me tell you, that's not just form, that's substance. We are swamped with work. We have incredible numbers of things to read. And when we pick up a brief, we don't want to have to file through it looking for various areas. When I pick up a brief and I'm looking for a particular issue, I go immediately to the table of contents. That way I go, boom, and I'm on page 22 and it's there. So you're missing a table of contents. Your reply brief, I don't know what happened in your reply brief, but you ran the risk of getting your entire appeal dismissed for failure to comply with the rules. The other thing that we do is, believe it or not, we don't really accept anything that's in the briefs. We go to the records. So that's why we want an excerpt. And if your reply brief fails to tell us where we can find it in the excerpt, then I end up digging all over the excerpt to try to find it. So eventually I end up reading the whole trial anyway. I would hope in the future that the rules aren't just form. They are substance. I noted that myself. I read through those, Your Honor. I apologize. My office did as well as you. Okay, thanks. Again, constructive. Thank you. I noticed that and I apologize. And frankly, I think it's adequately clear, and I only add this as constructive help to all Idaho attorneys, when you file a brief in the Idaho Supreme Court, they have one set of rules as to what they're to put in the brief. When you file it with us, there's quite another. And often we have found some Idaho counsel file all their appellate briefs under the Idaho Supreme Court rules rather than our rules, and therefore they don't comply at all. And what Judge Strass really trying to do here is he's just trying to say, this really helps us to follow what needs to be done, and we took the broad view and didn't throw this case out. We sent our clerks and ourselves into this record as best we could and did the best we could based on what we had in front of us because we knew it was Swofford and we knew that it was Casperson and not Casperson's necessary on Casperson's briefing, but we determined we wanted to get to the bottom line. But let it be heard and let it be said that we really do want you to do it the way it ought to be done. And we intend to have a few little helps. I hate to say this with Boyle sitting here who has all these conferences that he's in charge of, but at the appropriate conference, we're more than happy to come and tell you why we're different than the Supreme Court is and how you really ought to get it done. And we're only saying this to help you, Mr. Swofford. I understand. I apologize. And I appreciate Judge Trott and the way he took up that issue because I was about to take it up and he personal privileged it before I got there. Now we'll come and shake your hand. Case 08-35063, Wyatt v. Horkley Self-Service, Inc., is now submitted. Thank you very much. Thank you for being here today. Thank you for this opportunity. We will now see you all as we continue this big day of dedication for a lovely facility. Thank you very much. All rise. This court for this session stands adjourned.
judges: Thompson, Trott, Nr Smith, Cjj